# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 39766**

————————————

**UNITED STATES**
*Appellee*

**v.**

**Clarence L. JONES, III**
Airman First Class (E-3), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 17 February 2021

————————————

*Military Judge:* Bradley A. Morris.

*Approved sentence:* Bad-conduct discharge, confinement for 200 days, restriction to the limits of Cannon Air Force Base, New Mexico, for 60 days, forfeiture of all pay and allowances, reduction to E-1, and a reprimand. Sentence adjudged 12 April 2019 by GCM convened at Cannon Air Force Base, New Mexico.

*For Appellant:* Lieutenant Colonel Garrett M. Condon, USAF; Major Benjamin H. DeYoung, USAF.

*For Appellee:* Lieutenant Colonel Brian C. Mason, USAF; Major Jessica L. Delaney, USAF; Mary Ellen Payne, Esquire.

Before MINK, KEY, and ANNEXSTAD, *Appellate Military Judges*.

Judge KEY delivered the opinion of the court, in which Senior Judge MINK and Judge ANNEXSTAD joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————————

KEY, Judge:

A general court-martial composed of a military judge sitting alone convicted Appellant, contrary to his pleas, of seven specifications of assault consummated by a battery in violation of Article 128, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 928, and one specification of communicating a threat in violation of Article 134, UCMJ, 10 U.S.C. § 934.[1,2] He was sentenced to a bad-conduct discharge, confinement for 200 days, restriction to the limits of Cannon Air Force Base, New Mexico, for 60 days, forfeiture of all pay and allowances, reduction to the grade of E-1, and a reprimand. The convening authority approved the sentence as adjudged.

On appeal, Appellant raises four issues: (1) whether his convictions (on all specifications) are legally and factually sufficient; (2) whether his convictions should be set aside due to Government discovery violations; (3) whether his sentence is inappropriately severe; and (4) whether his due process rights were violated by the lack of speedy appellate review. Appellant personally raises the first three issues pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982) and the fourth issue through counsel. We have carefully considered Appellant's second and third claims and find they warrant neither discussion nor relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987). Finding no error prejudicial to the substantial rights of Appellant, we affirm.

## I. BACKGROUND

The charges in Appellant's case arise from his volatile relationships with two women, KP and AV. Appellant enlisted in the Air Force in late July 2014, and in December of that year—during a break in his technical training—he went home to Las Vegas, Nevada, for approximately two weeks. It was during that trip he met KP, who, at the time, was a civilian.[3] According to KP, she and Appellant spent time together nearly every day during Appellant's break for "maybe a week or two" until Appellant had to return to San Angelo, Texas, to

---

[1] All references in this opinion to the Uniform Code of Military Justice (UCMJ) and Rules for Courts-Martial (R.C.M.) are to the *Manual for Courts-Martial, United States* (2016 ed.).

[2] Appellant was acquitted of two additional specifications of assault consummated by a battery in violation of Article 128, UCMJ, and two specifications of sexual assault in violation of Article 120, UCMJ, 10 U.S.C. § 920. A third specification of sexual assault was withdrawn and dismissed after arraignment but before any evidence was introduced.

[3] KP later enlisted in the Air Force and was on active duty at the time of Appellant's court-martial. We do not include her grade in this opinion.

complete his training. The two kept in touch via text messaging and videoconferencing applications, discussing how they would move in together when Appellant returned to Las Vegas, where he said he was going to be stationed for his first permanent duty assignment.

In anticipation of Appellant completing his training, KP traveled to Texas in early February 2015 to attend his graduation ceremony. She stayed with another woman, Ms. KK, for part of the trip and with Appellant at an off-base hotel for the remainder. KP testified at Appellant's court-martial that he assaulted her several times at the hotel, seemingly in his sleep. KP said that one evening Appellant came out of the bathroom and began cursing at her while she was lying in the bed watching a video. She stood up and walked over to him, asking him if he was okay and if he was awake, but Appellant did not respond. She said Appellant then "choked" her and "just went back to bed" after doing so. When she later confronted him about this episode, he claimed to have been asleep and had no recollection of the events, but he also laughed about it. KP was able to take a short video another night in which Appellant squeezed her throat with his hand while she was lying in bed under the covers, a video she showed to Appellant in an attempt to convince him to see a "sleep doctor." Shortly after taking the video, KP showed it to Ms. KK who testified that, in the video, Appellant appeared awake and KP did not appear perturbed or frightened by Appellant's conduct.

Also during KP's trip to Texas, Appellant revealed he was not going to be assigned to a base in the Las Vegas area after all, and that he instead would be stationed at Cannon Air Force Base near Clovis, New Mexico. In this same conversation, Appellant asked KP to marry him and to accompany him to Cannon, and she agreed to do both. KP and Appellant were married on 5 February 2015, and they moved into an apartment in Clovis shortly thereafter.

On either 31 July or 1 August 2015, KP told Appellant she had cheated on him the previous night, leading to a confrontation between Appellant and KP in the parking lot of the Clovis shopping mall where she worked. KP said this episode devolved into Appellant kicking her in the head and on the chest. According to her, they eventually returned to their apartment where they continued arguing until Appellant pushed her against a wall and "choked her . . . real short." Then, Appellant put his hand around her throat again and "shoved [her] against the wall." She testified at Appellant's trial that Appellant was squeezing her neck so hard that she "couldn't breathe," her "vision was getting blurry," and she was having difficulty speaking. After Appellant released her, KP called an aunt of hers who lived in Ohio. KP's aunt, who herself had previously served in the Air Force, told KP to stay on the phone with her and to go to a neighbor's apartment to call the police, which KP did. In the ensuing 911 call, KP asked for someone to escort her to her apartment so that her husband

"doesn't touch [her]," but she did not explicitly tell the 911 operator she had been assaulted. Meanwhile, KP's aunt purchased KP a plane ticket to Ohio leaving later that day.

At the end of the 911 call, a Clovis police officer was dispatched to assist KP with entering her apartment so that she could retrieve some personal items. After doing so, the officer gave KP a ride to the mall, where she was going to pick up some other personal items from the store where she worked. The officer then drove KP to the police station and took her into the lobby area "just so she had somewhere to be so she wasn't stuck outside." No one at the police department attempted to interview KP about the day's events or question her as to why she wanted police assistance, and KP eventually called Appellant and asked him to come to the station and drive her to an airport some 90 minutes away, which he agreed to do.

KP flew to Ohio, and approximately five days later she notified the local law enforcement authorities there that Appellant had assaulted her in the mall parking lot and then in their apartment. The responding officers took photographs of the areas of KP's body where she said she had been injured during the assault and sent those pictures back to the Clovis police department. Other than documenting the receipt of those pictures, the record does not indicate the Clovis police department took any further action regarding the case.

Around the same time KP went to Ohio, Appellant met AV—a civilian woman who lived a few miles outside of Clovis—through an online dating application, and they began dating. Two months later, in October 2015, KP traveled to Las Vegas to meet with Appellant to see if they could work things out, but during that trip she learned that Appellant had been seeing AV, whom KP had never met. KP returned to Ohio, eventually concluding her marriage with Appellant was over.

The following month, in November 2015, AV told Appellant she was feeling symptoms consistent with being pregnant—symptoms she was somewhat familiar with due to having had two children prior to meeting Appellant. Appellant responded by repeatedly punching AV in her stomach with his fists despite her pleas that he stop. Once AV got away from Appellant, she left his apartment and went to a friend's house where Appellant later called her and told her that he was "just . . . joking and playing around with [her]." At Appellant's court-martial, AV testified Appellant's punches had left bruises on her stomach and that she threw up blood later in the day after Appellant assaulted her.[4]

---

[4] The record does not disclose whether or not AV was actually pregnant at the time, but there is no further reference in the record to AV possibly being pregnant after this incident.

Despite this incident, Appellant and AV continued their relationship, during which Appellant told AV that he had physically assaulted KP and that he pretended to be asleep "as an excuse . . . he used to hit [her]."

After about five months passed, in April 2016, AV drove with a friend of hers to Appellant's apartment where AV told Appellant she had seen him out at a movie with another woman. The friend stayed outside in the car while AV and Appellant went inside where tensions escalated, culminating in Appellant pushing AV against a wall and putting his hands on her neck. AV described the pressure on her neck as "kind of tight" and causing "some pain" as well as leading AV to fear Appellant "was going to choke [her] to death." Once Appellant let go, AV went out to her car where her friend was waiting. Crying, AV told her friend that Appellant had "choked her."

Meanwhile, on 31 May 2016, KP enlisted in the Air Force.[5] During her basic training and then during her follow-on technical training, she learned about the Air Force's Sexual Assault Prevention and Response program, and—after a briefing by a first sergeant—KP reported that Appellant had assaulted her.[6]

On 4 July 2016, approximately three months after Appellant assaulted AV by squeezing her neck, the two were in Appellant's bedroom when AV made a joke that upset Appellant. According to AV, Appellant's reaction involved pushing her to the ground, hitting her in the face with his knee, kicking a jug of water in her direction, grabbing her by the shoulder, and then pulling her part way up a staircase. The altercation left AV with bruises on her shoulder which she documented in pictures she took. Appellant's roommate's girlfriend was in the apartment at the time and heard the altercation, which she described at Appellant's court-martial as the two "screaming at each other pretty loudly" and "what sounded like someone being shoved into a wall." Not wanting to continue listening to the fight, she left the apartment before Appellant and AV emerged from the bedroom.

AV and Appellant were prodigious text message users, and they sent multiple messages to each other on various occasions referring to these assaults. In these exchanges, Appellant did not so much disavow his conduct as he sought to rationalize and minimize what he had done. For example, Appellant wrote in October 2016, "I have put my hand around ur neck while yelling, but I did not choke ur a[*]s I'd seriously have u f[**]ked up if I did and yea them arm bruises were from me trying to prevent u from leaving."

---

[5] Appellant and KP divorced in July or August of 2016.

[6] KP accused Appellant of sexually assaulting her. Appellant was charged with two specifications of sexual assault based upon the accusations, and he was acquitted of both.

Appellant and AV continued seeing each other, deciding to attend a 1 November 2016 concert together at a small Albuquerque venue—a few hours' drive from Clovis—even though their relationship was strained at that point. According to AV's testimony, she and Appellant began arguing during the concert, and Appellant started pushing her until security guards responded. Appellant told the guards AV would not leave him alone, and the guards subsequently ejected her from the concert, but allowed him to stay. Standing outside in the parking lot, AV began sending Appellant text messages to the effect that he had her car keys and hotel room key and that she was alone in a parking lot in an unfamiliar city. Appellant came out to the parking lot and another altercation ensued. AV said Appellant yelled at her, pushed her, and spit in her face; she responded by punching him in his face. At some point, Appellant took AV's phone away from her, and she testified he threw it on the ground and "kept stomping on it" until it was "completely broken." He also took a video of AV with his own phone, telling her "he would use that against [her]." Appellant then went back into the concert.

Still without keys to either her car or the hotel room, and now without a functioning phone, AV walked up to the entrance to the concert venue and explained to a woman what had happened. This woman, in turn, told the security guards Appellant needed to be removed from the concert. Appellant was then ejected from the venue and he again confronted AV in the parking lot. They got into the car and Appellant put AV into "a chokehold" by wrapping his arm around her neck while recording her with his phone. AV testified she remembered "barely being able to breathe" and "trying to force words out of [her] mouth," and that she "felt a lot of pain in [her] neck and in [her] head." Once Appellant released AV, he said that if she told anybody, "he would kill [her] and [her] children."

The two went to their hotel room where they spent the night. The next morning, Appellant bought AV a new phone, and on the drive back to Clovis, Appellant reiterated his threat that if AV told anyone, he would kill her and her children. A few days later, on 5 November 2016, AV contacted KP for the first time and asked KP if Appellant had ever been violent with her. In the ensuing conversation—conducted in writing via a social media platform—the women discussed their experiences with Appellant, and AV told KP about Appellant punching her in the stomach; Appellant choking her at his apartment; the altercation on the fourth of July; and the events surrounding the Albuquerque concert. KP told AV military authorities were involved in her case and Appellant had been given a no-contact order.

Because AV continued to feel pain in her neck, she decided to go to a nearby hospital's emergency room on the same day as her conversation with KP. Medical records from AV's visit indicate she had a contusion to her mandible area,

but no fractures or visible bruising. While at the hospital, medical providers asked AV if she wanted to report the incident to the police, and she said she did.

In investigating KP's and AV's allegations, digital forensic examiners were able to recover over 13,000 text messages between Appellant and AV from Appellant's phone, as well as three video files from the night of the Albuquerque concert, one of which appears to show Appellant holding her head down against a car's center console. The analyst who testified at Appellant's trial said he found evidence that other videos or photographs had been taken between the time the recovered videos were recorded, but they had been deleted and could not be retrieved. He also testified that all of the text messages relevant to the allegations had been physically deleted by the phone's user, but he was able to recover them using forensic tools.

At trial, Appellant's trial defense counsel offered the testimony of an expert in the fields of neurology and general medicine. The expert said he did not see evidence of bruising to KP's face in the pictures taken by the Ohio police officer. He also said he did not believe Appellant punching AV in the stomach would have led her to throw up blood, testifying that "[u]sually abdominal trauma does not cause vomiting up of blood." The bulk of the expert's testimony focused on whether KP's and AV's testimony and AV's medical records were consistent with injuries caused by strangulation, although he conceded that strangulation often leaves no observable injuries, even in cases in which strangulation results in death.

Ultimately, the military judge acquitted Appellant of kicking KP in the mall parking lot, but he convicted Appellant of squeezing her throat with his hands on divers occasions between 1 February 2015 and 1 August 2015. With respect to AV, Appellant was convicted of punching her in the stomach in November 2015; grabbing her neck in April 2016; grabbing her arm and striking her in the face with his knee on 4 July 2016; pushing her and choking her on 1 November 2016, the night of the concert; and threatening to kill her and her children. For purposes of sentencing, the military judge merged the two assaults on 4 July 2016 with each other, as well as the two assaults on 1 November 2016, resulting in a maximum sentence of a dishonorable discharge, confinement for five years and six months, forfeiture of all pay and allowances, and reduction to the grade of E-1.

## II. DISCUSSION

### A. Legal and Factual Sufficiency

Appellant argues his convictions of the seven specifications of assault consummated by a battery as well as the one specification of communicating a

threat are legally and factually insufficient. Appellant's primary contention is that neither KP nor AV is a credible witness. He argues they both had personal biases against him and motives to fabricate the allegations against him; that they did not report the assaults in a timely manner; that they "colluded together prior to the Air Force investigation;" and the physical evidence and expert testimony "cast doubt" on the veracity of their testimony.

### 1. Law

We only affirm findings of guilty that are correct in law and fact and, "on the basis of the entire record, should be approved." Article 66(c), UCMJ, 10 U.S.C. § 866(c). We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (quoting *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017)). "The term reasonable doubt, however, does not mean that the evidence must be free from conflict." *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)). Circumstantial evidence may suffice. *See United States v. Kearns*, 73 M.J. 177, 182 (C.A.A.F. 2014) (citing *Brooks v. United States*, 309 F.2d 580, 583 (10th Cir. 1962)). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). As a result, "[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (alteration in original) (citation omitted).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are ourselves] convinced of the [appellant]'s guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *Wheeler*, 76 M.J. at 568 (alteration in original) (quoting *Washington*, 57 M.J. at 399).

**2. Analysis**

In order to find Appellant guilty of assault consummated by a battery, the Government was required to prove beyond a reasonable doubt: (1) that Appellant did bodily harm to a particular person, and (2) that the bodily harm was done with unlawful force or violence in the manner alleged. *See Manual for Courts-Martial, United States* (2016 ed.) (*MCM*), pt. IV, ¶ 54.b.(2). "Bodily harm" is defined as "any offensive touching of another, however slight," and the act "must be done without legal justification or excuse and without the lawful consent of the person affected." *MCM*, pt. IV, ¶ 54.c.(1)(a). "Unlawful force or violence" is demonstrated if an accused "wrongfully caused the contact, in that no legally cognizable reason existed that would excuse or justify the contact." *United States v. Bonner*, 70 M.J. 1, 3 (C.A.A.F. 2011) (citation omitted).

Self-defense is an affirmative defense to a charge of assault consummated by a battery and has three elements. First, the accused must have apprehended, on reasonable grounds, that bodily harm was about to be inflicted on him; second, the accused must have believed that the force he used was necessary for protection against bodily harm; and, third, the force used by the accused must have been "less than force reasonably likely to produce death or grievous bodily harm." *See* Rule for Courts-Martial (R.C.M.) 916(e)(3). These same principles apply to defense of another, provided the accused uses no more force than the person he was allegedly defending was permitted to use. R.C.M. 916(e)(5). Once raised, the Government has the burden of proving beyond a reasonable doubt that the defense did not exist. R.C.M. 916(b)(1).

As charged here, conviction of communicating a threat required proof that Appellant "communicated certain language expressing a present determination or intent to wrongfully injure" another, and that under the circumstances, the conduct was of a nature to bring discredit upon the armed forces. *MCM*, pt. IV, ¶ 110.b. The Government need not establish Appellant actually intended to carry out the threat. *MCM*, pt. IV, ¶ 110.c.

### a. Assault of KP by Squeezing Her Throat

Regarding the specification alleging Appellant squeezed KP's throat with his hands on divers occasions, Appellant claims KP identified only two specific times she alleged Appellant assaulted her: the time KP thought Appellant was asleep and the time after the confrontation in the mall parking lot. With respect to the first of these, Appellant argues KP's testimony "made clear" Appellant "was not awake at the time" and, in any event, KP did not appear to be distressed in the short video she showed the woman she had stayed with, Ms. KK. He further argues KP's allegation only surfaced after the marriage "fell apart" and after she "colluded" with AV. With respect to the second incident,

Appellant points to the fact no witnesses saw any marks on KP's neck and that KP allowed Appellant to drive her to the airport—conduct he contends is inconsistent with an allegation of assault. He suggests that even if he concedes he "placed his hand on KP's neck," he might have done so "to protect himself" from KP, who he argues was "hysterical."[7]

We conclude a reasonable factfinder could find Appellant guilty beyond a reasonable doubt of assault consummated by a battery against KP by squeezing her throat with his hands on more than one occasion. KP testified about the incident in the hotel room where Appellant came out of the bathroom and began cursing at her. She said that when she confronted him, Appellant "choked her" with his hand. KP also demonstrated Appellant's physical motions at trial, and trial counsel described her demonstration for the record: "The witness used her right hand to put it up towards her neck with her thumb on the right-hand side and the forefingers on the left-hand side." When asked what Appellant did with his hand once it was on her throat, KP answered, "[s]queezed it." She said Appellant's actions had left her "[s]cared, taken aback, surprised, confused." Although KP believed Appellant was asleep at the time, the notion Appellant committed the assault while actually asleep is squarely undermined by his own admission to AV that he used to pretend to be asleep as an excuse to hit KP. There is no evidence KP consented to this conduct or that Appellant had any lawful purpose for squeezing KP's neck. Indeed, KP was concerned enough about his conduct that she used her phone to record another instance of Appellant squeezing her neck in order to persuade him to seek medical help. Although KP may have perceived Appellant to have been acting in his sleep at the time, her perception neither indicates KP consented to the contact nor binds a fact finder to conclude Appellant was acting involuntarily or unconsciously.

KP also testified about Appellant assaulting her at their apartment after the confrontation in the mall parking lot by twice grabbing her neck. As to the second of these two instances, she said that Appellant had his hand around her throat as he shoved her against the wall to the point she found it difficult to breathe and speak, and her vision began to get "blurry." After she left the

---

[7] Appellant arrives at this characterization by pointing to the testimony of his best friend, Senior Airman (SrA) JM, and his mother, Ms. JJ. SrA JM claimed he had been in the mall parking lot and witnessed the confrontation between Appellant and KP— he testified KP seemed "a little bit" upset at the time. Ms. JJ testified KP had called "crying hysterically" because Appellant had left her due to her cheating on him and that she felt suicidal. Ms. JJ said KP was alone in the apartment at the time of the call, and Ms. JJ told KP she should call someone to come to the apartment to be with her.

apartment, KP sought the assistance of the local police to re-enter the apartment, and she then flew to Ohio to live with her aunt. Once in Ohio, KP reported the assault to the local police, although the record does not indicate the specifics of her report. Again, there is no evidence KP consented to Appellant strangling her, that is, that his contact with her neck was anything but offensive to her. Appellant's self-serving suggestion that he was trying to "protect himself" from KP is unsupported by the record, and there is no evidence Appellant apprehended that KP was about to inflict bodily harm on him such that he would be permitted to strangle her in response.

Appellant's argument that KP and AV "colluded" to fabricate the allegation of him squeezing KP's neck likewise cannot be squared with the evidence. First, KP recorded Appellant squeezing her neck in bed after he had previously squeezed her neck on an earlier evening. KP then showed the video to Ms. KK—months before Appellant met AV, and nearly two years before KP and AV corresponded for the first time. AV contacted KP via social media on 5 November 2016, and that entire exchange was admitted in evidence at Appellant's court-martial. Rather than indicating collusion, the exchange demonstrates AV and KP disclosed to each other some details of the abuse they respectively suffered at Appellant's hands. In a relevant portion of the conversation, AV asked KP why she finally decided to be done with Appellant, and KP wrote, "I finally decided because I moved in with my aunt, she flew me out the night I told her he choked me." We see nothing in the record supporting Appellant's suggestion the women "colluded" to fabricate the allegations of Appellant assaulting KP by squeezing her neck. We also decline to read much into KP's decision to have Appellant—her husband—drive her to the airport. KP testified she called Appellant because she was at the police station and "couldn't find anywhere to go" and that Appellant was her "last resort" to make the 90-minute trip to the airport when a friend of hers could not get off work. She also explained that she "figured by then [Appellant] must have calmed down." While KP's seeking a ride to the airport from the man she says assaulted her earlier in the day may seem on its face to be counterintuitive, it does not serve to refute her claim Appellant had, in fact, squeezed her neck with his hands. A rational trier of fact could find all the elements of this offense beyond a reasonable doubt, as well as that Appellant was not acting in self-defense.

### b. Assault of AV by Punching Her Stomach

Appellant argues the evidence is insufficient to prove he assaulted AV by punching her in the stomach because AV testified at trial that she "wasn't sure if [Appellant] was joking or not" and expert testimony contradicted her claim that being punched in the stomach caused her to vomit blood. Appellant points to the fact AV did not immediately report this incident to the authorities, that

no one saw the bruises on her stomach, and that she stayed in a relationship with Appellant after it occurred.

Appellant's claim that AV thought Appellant might have been "joking" when he punched her in the stomach is taken somewhat out of context. AV testified, "I remember mentioning to him that I had felt pregnancy symptoms . . . and he started punching me in the stomach. . . . I asked him to stop; he didn't stop." AV said Appellant "seemed to have gotten angry" when she mentioned her symptoms, and she described Appellant as punching her approximately ten times with both of his closed fists using what she felt was "a lot of force" which was "painful." AV told Appellant she "needed to go," and she left the apartment, after which Appellant sent AV a number of text messages which she did not reply to. Eventually, Appellant called AV, and she testified she "told him what he did was not okay and he asked what did he do[,] and I told him about the punching in the stomach. He told me it was just him joking and playing around with me." When asked by trial counsel why she did not seek medical attention, AV answered,

> [B]ecause I was scared as to what would happen. I cared about him. I did not want him to get into trouble. I wasn't sure if he was joking or not just because I had not seen that from him. At the time I didn't know about the abusive person he is.

Notably, this incident occurred in November 2015, relatively early in AV's relationship with Appellant.

Trial defense counsel elicited expert testimony that punches to the abdomen are unlikely to result in the vomiting of blood. Such a fact could indicate Appellant's punches were not the proximate cause of AV's vomiting, but that conclusion would not indicate Appellant did not assault AV—instead, it would speak to the type and degree of injuries she suffered as a result. The Government was required to prove Appellant assaulted AV by causing her bodily harm, which is to say he touched her offensively, not that he caused a particular injury beyond that offensive touching. Appellant would have us conclude that if AV did not vomit blood because of the assault, then she must be lying about the entire episode, yet Appellant's own text messages to AV demonstrate he did, in fact, punch her in the stomach. In a text-message conversation on 28 October 2016, a few days before the concert in Albuquerque, AV wrote, "and you did punch me in the stomach that's why you always joke about it." Appellant responded,

> [ ] as a joke cuz I always said that if u were pregnant that's what I'd do so I did when u were acting pregnant. Not even hard that was some playful ass punches. If I'm that strong somehow that you consider that playful a[*]s sh[*]t abuse and wanna say it

caused u to puke blood imagine wtf a real choke would do then?! F[**]kin ridiculous dude.

On 18 September 2016, during another text-message exchange, AV wrote, "You can never make me believe what you've done to me is okay . . . the bruises, punching me in the stomach, you've choked me . . . none of that will ever be okay. . . . I've lied to you a few times . . . you've done that A LOT plus everything else." Appellant replied, "More than a few way more than a few times. Why are we even talking bout this . . . ." To which AV responded, "Yep the conversation always gets cut when what you've done/do gets brought up."

Appellant's admission that he did, in fact, punch AV in response to her saying she was experiencing pregnancy symptoms, in conjunction with AV's testimony that Appellant persisted in punching her after she told him to stop doing so, is more than adequate to permit a rational factfinder to conclude Appellant committed an assault consummated by a battery upon her. AV's statement that she did not seek medical attention because she was not sure if Appellant was joking or not was speculation on her part as to Appellant's intent; a rational trier of fact could readily conclude Appellant intentionally committed an offensive touching by punching AV, regardless of what AV surmised Appellant's intentions were at the time.

### c. Assault of AV by Grabbing Her Neck

Appellant argues there is reasonable doubt whether he actually committed the offense of grabbing AV's neck, and it was "reasonably likely" he was defending himself after AV saw Appellant out with another woman. Appellant asserts AV "created this confrontation" by waiting for him to come home and then proceeding "to scream at him for cheating on her." Appellant claims that when AV left his apartment and got in the car with her friend, she came out "without any bruises and nothing to report."

Although there was no evidence of bruising to AV's neck after this event, AV's friend testified AV was crying when she exited the apartment and AV told her "that they were fighting and that he choked her." In addition to this immediate report, Appellant's text messages corroborate that he did, in fact, put his hand on AV's neck. In late October 2016, Appellant wrote: "I have put my hand around ur neck while yelling but I did not choke ur a[*]s I'd seriously have u f[**]ked up if I did and yea them arm bruises were from me trying to prevent u from leaving I ain't punch u ain't kick u . . . ."[8] He further wrote: "Me having my hand around ur neck while yelling was very wrong and I should've just let

---

[8] In the text exchange, AV told Appellant the bruises were on her shoulder, not her arm, and they were caused when Appellant dragged her up the stairs—referring to the events of 4 July 2016.

u leave instead of trying to stop u by grabbing on ur arm which left those bruises. I was wrong. But u sit here and act like . . . I'm just women beater galore . . . ."

Thus, contrary to his self-defense claim, Appellant admitted that his choking of AV was "very wrong," indicating it was not carried out in a lawful effort to protect himself. Although the evidence indicates AV was upset after having caught Appellant with another woman, there is no evidence in the record she acted violently or attempted to assault him in such a way that he could successfully invoke a claim of self-defense. We conclude a rational trier of fact could determine Appellant committed this assault consummated by a battery.

### d. Assault of AV on 4 July

Appellant argues the evidence is inadequate to prove that he either assaulted AV by grabbing her arm or by striking her in the face with his knee. His argument here is that there was "nothing" corroborating AV's allegations, to include not having any bruises on her face. Appellant asserts he and AV were "yelling loudly at each other," and there was a "clear call for Appellant to both defend himself as well as others," permitting Appellant to use "minimal force" to stop AV "from driving in a dangerously upset state."

Appellant's own text messages admit that he grabbed AV's arm and pulled her up some number of stairs in order to prevent her from leaving his apartment. He wrote on 27 October 2016:

> I grabbed ur arm and yeah pulled u up like a few stairs then u just went with it cuz u realized u weren't getting away guess I should've just let u get behind the wheel while u were emotionally unstable af that's safe right? . . . if I kneed you I was completely unaware and it was a f[**]kin accident. Again if my intent was to hurt u u would have been in horrible condition.

Appellant continued, "I probably saved ur life by letting u calm tf down before driving . . . I admit to what I did do and it was wrong but I did not beat ur a[*]s."

Thus, Appellant corroborates AV's testimony there was an altercation, further corroborated by the testimony of Appellant's roommate's girlfriend who heard loud yelling and what sounded like a body hitting the wall. A factfinder could readily believe AV's testimony and thereby conclude Appellant assaulted her both by grabbing her arm and striking her in the face. A rational trier of fact could similarly dismiss Appellant's claim of only accidentally striking AV's face as an attempt to minimize his misconduct and disavow any aspects of the assault he could not rationalize. Similarly, Appellant's claim the assault was excused out of his concern that AV might have caused harm by driving her car was merely hypothetical and highly speculative at that point, falling well short

of the requirement that he demonstrate he reasonably believed AV was about to be harmed (or that she would harm a third party) in order to validly invoke the doctrine of defense of others.

### e. Assault of AV at the Concert in Albuquerque

Appellant argues the evidence is insufficient to prove that he either pushed AV in the parking lot of the concert venue or choked her on her neck with his arm. Appellant points to the fact AV was the one initially removed from the concert and that it was Appellant who used his phone to record the episode. He argues the videos demonstrate it was AV who broke her phone, not Appellant; that Appellant was bleeding; and that AV is "a recurring liar." He also points to AV not immediately reporting the incident to law enforcement or seeking medical attention, and when she did seek medical attention, she did not have any "fractures or bruising." Appellant suggests he was "doing only what [was] necessary to protect himself."

Having viewed the videos in question, we disagree with Appellant's characterization of what they show. Contrary to Appellant's claims, the videos do not show the destruction of AV's phone nor do they provide any insight into AV's truthfulness. Two of the three videos depict an emotional argument in a parking lot in which AV appears to strike or attempt to strike Appellant after Appellant goads her to do so. The third depicts a later point in which both Appellant and AV are inside of a vehicle and Appellant appears to have forced AV's head down toward the vehicle's center console. AV is crying loudly in this third video. We further note the evidence at trial indicated several intervening videos or photographs had been purposely deleted from Appellant's phone at some point, creating a record of events that is less than complete and possibly skewed in such a way as to paint Appellant in the best possible light. In addition, the fact that Appellant bought AV a new phone the next morning suggests Appellant was the person responsible for the destruction of her old phone and that he was seeking to make amends.

AV testified she hit Appellant in the parking lot after Appellant pushed her and spit in her face, however, her testimony was that this occurred during the first time Appellant came out to the parking lot after AV had been kicked out of the concert. Prior to Appellant pushing AV, there is no indication AV acted violently or did anything that would have caused Appellant to be in apprehension of receiving immediate bodily harm; thus, the evidence indicates Appellant was the first person to resort to violence by pushing AV. Appellant subsequently went back into the concert and was later ejected from the venue, and it was at this time AV and Appellant got into the car and Appellant proceeded to put AV into a chokehold. Thus, whatever ability Appellant had to invoke self-defense evaporated when he withdrew from the initial confrontation in or-

der to return to the concert. There is no evidence Appellant had reason to believe AV was about to inflict bodily harm upon him when they were in the car, much less that the level of force Appellant used was necessary to defend himself.

Although AV did not immediately report the assault, she did do so about four days later. The fact she did not have any fractures is uncompelling considering AV never alleged Appellant broke any bones, and the absence of fractures does not so much indicate no assault occurred, but rather speaks to the relative degree of the force used. Moreover, Appellant's claim AV was unbruised as evidence of her suffering no injuries is somewhat rebutted by the fact her medical records disclosed a contusion to her mandible along with her reports of headaches and neck pain days after the assault. Once Appellant choked AV's neck without her consent, the charged offense of assault consummated by a battery was complete, regardless of bruising—an injury the Defense's own expert testified is not always present in strangulation cases. The episode outside the concert was emotionally charged, but Appellant's decision to employ physical violence was not a legally permissible response under the facts presented here. We conclude the evidence is sufficient to support Appellant's convictions for his conduct in the concert parking lot.

### f. Threats to AV and Her Children

Appellant alleges his conviction for communicating a threat is infirm, because AV's testimony as to Appellant's threat to kill her and her children deviated from the language charged. The specification charging Appellant with threatening AV read, in relevant part, that Appellant stated "'I'll kill you and your children,' or words to that effect." AV's testimony about the threat was: "*if I tell anybody* he would kill me and my children" (emphasis added). Appellant further argues the evidence does not support his conviction because the threat was conditioned on whether or not AV reported Appellant's misconduct.

We agree with Appellant that the evidence demonstrated his threat was conditional—that is, he said he would kill AV and her children only if AV told anyone what occurred after Appellant was removed from the concert. However, Appellant had no right to impose any conditions on if, how, or when AV decided to report Appellant's misconduct. His imposition of such a wrongful condition on AV's actions does not preclude a finding that he expressed a then-existing determination to injure AV and her children. *See United States v. Alford*, 34 M.J. 150, 152 (C.M.A. 1992) (citing *United States v. Holiday*, 16 C.M.R. 28, 33 (C.M.A. 1954); *United States v. Shropshire*, 43 C.M.R. 214, 215 (C.M.A. 1971)). AV's reporting of the night's events was plainly something she had the ready ability to do in light of the fact she actually did report the events to law enforcement several days later. *See United States v. Phillips*, 42 M.J. 127, 131 (C.A.A.F. 1995) (a threat is not negated when the condition imposed on the

threat is reasonably possible of being fulfilled). AV testified that Appellant owned firearms and she testified to Appellant's use of violence to subdue her on various occasions. A rational trier of fact could therefore conclude Appellant was afraid his assault of AV would be discovered and that he threatened her and her children to pressure her to not report him, a threat AV would believe Appellant would follow through with.

Appellant is correct that AV's testimony did not precisely mirror the charged threat, as she testified he stated the condition of AV telling someone about the assault—a condition absent from the charged threat. Appellant's charge, however, included the caveat language of "words to that effect," which necessarily permits a degree of variability between the language charged and the language proved by the evidence. *See United States v. Fosler*, 70 M.J. 225, 229 (C.A.A.F. 2011) (citing *United States v. Sell*, 11 C.M.R. 202, 206 (C.M.A. 1953)) (the military justice system utilizes notice pleading). We conclude a rational trier of fact could find the additional conditional language of the threat fairly amounted to "words to that effect" and that Appellant is guilty as charged. We also conclude it would be no great leap for a factfinder to conclude Appellant's threat was the sort that would bring discredit upon the armed forces, especially in light of AV's awareness of Appellant's military service.

Considering the foregoing, Appellant's convictions are legally sufficient. After carefully considering the evidence presented at trial, we ourselves are convinced of Appellant's guilt beyond a reasonable doubt. We therefore conclude his convictions are also factually sufficient.

## B. Post-Trial Delay

Appellant asks us to find that his due process right to a speedy post-trial review was violated by the fact the convening authority did not take action on his case until 131 days after Appellant's sentence was announced. As a remedy, Appellant requests his confinement term be reduced by 31 days. We resolve this issue adversely to Appellant.

### 1. Additional Background

Appellant's trial concluded on 12 April 2019. According to the court reporter's chronology included in the record of trial, she began transcribing Appellant's trial on 24 April 2019 (the 12th day after trial ended).[9] Her chronology

---

[9] Neither Appellant nor the Government addressed whether this chronology and a second chronology prepared by the legal office (titled "*Moreno* Chronology") are part of the "record" as defined in R.C.M. 1103(b)(2) or are "matters attached to the record"—also referred to as "allied papers"—under R.C.M. 1103(b)(3). *See United States v. Jessie*, 79

indicates that in those 12 days, she completed the transcription of another trial and served as a reporter for both a second trial and a preliminary hearing under Article 32, UCMJ, 10 U.S.C. § 832. Between 24 April 2019 (day 12) and 14 May 2019 (day 32), the court reporter worked on transcribing the first two days of Appellant's six-day court-martial, served as a court reporter on a four-day court-martial, prepared documents for another trial, and took four days of leave. On 14 May 2019 (day 32), the court reporter sought transcription assistance for two of the days of Appellant's trial, and on 28 May 2019 (day 46), the court reporter sent trial counsel the transcript of the first day of trial to review. By 2 July 2019 (day 81), the transcription of the two days the court reporter sought assistance with was completed. Throughout this time, the court reporter followed a cycle of transcribing segments of Appellant's court-martial, sending trial counsel and the military judge portions of the transcript as she completed them, serving as a reporter for other courts-martial, and performing transcription duties for other cases, ultimately authenticating Appellant's record on 19 July 2019 (day 98).[10]

On 26 July 2019 (day 105), the staff judge advocate signed his recommendation, which was served on Appellant on 29 July 2019 (day 108). On 8 August 2019 (day 118), Appellant's trial defense counsel requested an additional seven days to submit clemency matters, a request which was granted, and Appellant's deadline was extended to 16 August 2019 (day 126). On 20 August 2019 (day 130), Appellant's trial defense counsel sent an email informing the staff judge advocate that Appellant would not be submitting any matters in clemency. The convening authority took action the following day (day 131).

**2. Law**

We review whether an appellant has been denied the due process right to a speedy post-trial review de novo. *See United States v. Moreno*, 63 M.J. 129, 135 (C.A.A.F. 2006) (citing *United States v. Rodriguez*, 60 M.J. 239, 246

---

M.J. 437, 440–41 (C.A.A.F. 2020). We note Air Force Instruction 51-201, *Administration of Military Justice*, ¶ A11.2.2 (18 Jan. 2019), describes the creation of the so-called *Moreno* chronology and its inclusion in the record of trial, while Air Force Manual 51-203, *Records of Trial*, Atch. 2 ¶ 3 (4 Sep. 2018), similarly calls for the inclusion of the court reporter chronology in the record of trial. Appellant cites to the court reporter's chronology in his assignment of errors, and the Government cites to both chronologies in its answer, and we will consider these documents since neither party has raised any objection respecting the documents. *Cf. United States v. Stanton*, ___ M.J. ___ , No. 19-0449, 2021 CAAF LEXIS 28, at *5 n.2 (C.A.A.F. 13 Jan. 2021) (considering discharge request and action upon it without deciding whether they were part of the record because parties did not object).

[10] According to the *Moreno* chronology, a second court reporter was assigned on 18 June 2019 (day 67), and this court reporter assisted at least through 11 July 2019 (day 90).

(C.A.A.F. 2004); *United States v. Cooper*, 58 M.J. 54, 58 (C.A.A.F. 2003)). *Moreno* established a presumption of facially unreasonable delay when the convening authority does not take action within 120 days of the completion of trial. *Id*. at 142. When there is such a delay, we examine the four factors set out in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice." *Moreno*, 63 M.J. at 135 (citing *United States v. Jones*, 61 M.J. 80, 83 (C.A.A.F. 2005); *Toohey v. United States*, 60 M.J. 100, 102 (C.A.A.F. 2004) (per curiam)). "No single factor is required for finding a due process violation and the absence of a given factor will not prevent such a finding." *Id*. at 136 (citing *Barker*, 407 U.S. at 533).

*Moreno* adopted the post-trial delay framework for analyzing prejudice: "(1) prevention of oppressive incarceration pending appeal; (2) minimization of anxiety and concern of those convicted awaiting the outcome of their appeals; and (3) limitation of the possibility that a convicted person's grounds for appeal, his or her defenses, in case of reversal and retrial, might be impaired." *Id*. at 138–39 (citations omitted). Even in the absence of prejudice, we have authority under Article 66(c), UCMJ, 10 U.S.C. § 866(c), to grant relief for excessive post-trial delay when we determine such relief is appropriate. *United States v. Tardif*, 57 M.J. 219, 224 (C.A.A.F. 2002) (citations omitted). Our court has established the following factors to be considered to determine if relief under *Tardif* is appropriate:

1. How long did the delay exceed the standards set forth in [*Moreno*]?

2. What reasons, if any, has the government set forth for the delay? Is there any evidence of bad faith or gross indifference to the overall post-trial processing of this case?

3. Keeping in mind that our goal under *Tardif* is not to analyze for prejudice, is there nonetheless some evidence of harm (either to the appellant or institutionally) caused by the delay?

4. Has the delay lessened the disciplinary effect of any particular aspect of the sentence, and is relief consistent with the dual goals of justice and good order and discipline?

5. Is there any evidence of institutional neglect concerning timely post-trial processing, either across the service or at a particular installation?

6. Given the passage of time, can this court provide meaningful relief in this particular situation?

*United States v. Gay*, 74 M.J. 736, 744 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016).

### 3. Analysis

Because the convening authority did not take action until 131 days after the conclusion of Appellant's court-martial, the 120-day threshold established in *Moreno* was exceeded by 11 days. Thus, this passage of time amounts to a presumptively unreasonable post-trial delay. In considering the reasons for the delay, the chronologies included in the record of trial indicate the primary delay in completing post-trial processing was the transcription of the proceedings. Ultimately, the transcript amounted to 545 pages, and the entire record of trial spanned seven volumes. The transcription was not completed until 98 days after the court-martial, yet there is no indication the Government was either intentionally or negligently dilatory in completing this transcription, as at least two court reporters were involved and a portion of the proceedings was transcribed by a third party. In addition, the court reporter provided the sections of the records to the military judge and trial counsel to review as she completed them, presumably to streamline the review process and avoid any additional delays in finalizing the transcript. The court reporter's chronology indicates she was performing reporting duties for a variety of other proceedings during these 98 days.

Appellant argues the court reporter could have started transcribing his earlier motions hearing in the period of time between that hearing and his trial. While true, we agree with the Government that transcribing the earlier motions hearing prior to Appellant being convicted may not have been the most judicious allocation of court-reporter resources, in that if Appellant was acquitted, no transcript would be required, and spending time transcribing matters in such a case would only serve to delay the production of records in other cases. While taking 98 days to transcribe Appellant's court-martial is not ideal, the period appears to be the product of little more than scarce and heavily tasked court-reporter resources.

Once the transcript was complete, the staff judge advocate took one week to review it and prepare his recommendation to the convening authority, a recommendation which was served on Appellant, who was apparently incarcerated in another state, three days later—108 days after the completion of his trial. Appellant was entitled to ten days to file clemency matters, but on the tenth day, he requested a seven-day extension, which was granted. It was during this extension that the case passed the 120-day mark. Appellant still submitted no matters, and the convening authority's legal office apparently waited four days after the extension expired for Appellant's trial defense counsel to confirm he, in fact, did not wish to submit any matters. Once that occurred, the

convening authority took action the very next day. Thus, 33 days elapsed between the authentication of the record of trial and action. Of those 33 days, 7 days were spent reviewing the record and preparing the staff judge advocate's recommendation, it took 3 days to serve Appellant with the recommendation, 18 days involved waiting for Appellant to submit matters, 4 days passed before Appellant confirmed he did not want to submit matters, and action was taken 1 day later. In sum, 22 of the 33 days were allocated to Appellant's opportunity to submit clemency matters, an opportunity he did not avail himself of, and—in light of the foregoing—we conclude the reasons for the delay between Appellant's court-martial and the convening authority's action do not demonstrate any intentional or negligent delay on the Government's part. The Government, however, exceeded the 120-threshold, and we conclude this factor weighs in Appellant's favor, although only modestly.

As to the remaining *Barker* factors, Appellant did not assert a right to timely action by the convening authority at any time prior to action, and Appellant has identified no prejudice that he has suffered. Having considered Appellant's assignment of error, we have ourselves failed to identify any way in which Appellant was prejudiced. The delay neither resulted in oppressive confinement nor extended the length of Appellant's incarceration. Because we are not ordering a rehearing, Appellant's ability to defend himself at such a rehearing has not been impaired, and Appellant has not suggested he suffered any particularized anxiety or concern during the 131-day period. Where there is no qualifying prejudice from the delay, there is no due process violation absent a delay so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *Toohey*, 63 M.J. at 362. Based upon the evidence before us, the primary driver of the delay in the post-trial processing of this case was simply the court reporter's workload and not any negligence or malfeasance on the part of the Government. Considering the circumstances, to include spending three weeks ensuring Appellant had the opportunity to decide whether or not to submit clemency matters, we cannot find that the delay would adversely impact the public's perception of the military justice system. We have also considered the factors set out in *Gay*, and we conclude Appellant is entitled to no relief even in the absence of identifiable prejudice.

## III. Conclusion

The approved findings and the sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c).

Accordingly, the findings and sentence are **AFFIRMED**.



FOR THE COURT

AARON L. JONES
Deputy Clerk of the Court